STYLES, *alias* LEE, *alias* COMPTON, *v.* THE STATE.

No. 9087.   FEBRUARY 28, 1933.

*Arthur W. Powell, Marvin G. Russell,* and *Julius Setze,* for plaintiff in error.

*Lawrence S. Camp, attorney-general, John A. Boykin, solicitor-general, J. W. LeCraw,* and *E. A. Stephens,* contra.

RUSSELL, C. J. (After stating the foregoing facts.) The plaintiff in error, variously called Styles, Lee, or Compton, was jointly indicted with George W. Cox Jr., and Harry Kosnofsky, for the murder of Bennie Lichtenstein. Lichtenstein resided in an apartment on Ponce de Leon Avenue in the City of Atlanta. On the night of the homicide he was seen to enter his apartment, and shortly thereafter two of his acquaintances who occupied apartments in the same building heard three cries for help, and one pistol shot. They ran to Lichtenstein's apartment and found that he was dead with a bullet wound which entered on the right side and came out on the left side of his head. He was unclothed except with a nightshirt.

There was no evidences showing the motive of the murder was robbery. Money was found in Lichtenstein's pockets, his watch was untouched, and his diamond ring was not taken. A battered bullet was found about three feet from the dead body. No pistol or other weapon was found at the scene of the crime. There was no mark or other evidence to indicate that any shot had been fired in the room, other than that which inflicted the mortal wound. Quickly after the shot was heard, a man ran out of the apartment and across Ponce de Leon Avenue, entered a car, and drove rapidly away. A female witness living in the next house testified that the man who left the house used very urgent and excited language to a man who was at the wheel of the car, to induce him to leave as quickly as possible. Among many witnesses the State introduced Harry Kosnofsky, who testified that on the night of the killing he went with the accused to the apartment-house occupied by Lichtenstein, for the purpose of delivery of intoxicating liquor by Lee to Lichtenstein; that he (Kosnofsky) did not participate in the crime, but remained in the automobile on the opposite side of the street; that he heard the shot, and then Lee came running rapidly across the street, jumped into the automobile, and insisted that Kosnofsky should lose no time in moving as rapidly as possible from the scene. Kosnofsky did not testify that he entered into any agreement or conspiracy to furnish, sell, or carry the liquor to Lichtenstein. According to his evidence: "This car was some little distance away from the apartment of Bennie Lichtenstein. It was not close enough for me to see what was going on. . . I was driving it a part of the time that evening. . . I requested Mr. Lee to let me drive it a part of the time." On cross-examination he testified: "My purpose in being with Lee that night was to deliver some whisky. I did not have any such purpose as going on a robbery. The purpose was to deliver liquor, and it was delivered."

The defendant was arrested on Thursday following the killing on the Monday night preceding. The information which led to his arrest was given by a witness named Daley, who testified he had lost $275 in money, a pistol, a diamond stick-pin, and an automobile by being robbed several months before by the accused, Lee. Daley told Lieutenant Sturdivant where he had an engagement to meet Lee, so that Sturdivant would be near by and make the arrest. It was later developed in the evidence that Daley, after Studivant had

arrested Lee, informed him where he could and did find two pistols, one of them identified by Daley as the pistol of which he had been robbed. Daley testified that for several weeks after being robbed he had been very intimate with the defendant, Lee, and had discussed with him propositions looking to his participation in a robbery with Lee; that the diamond pin of which he had been robbed had been returned to him by Lee, who said he found it in a room in the rear of a barber-shop; that he (Daley) was permitted to see Lee, who was being kept incommunicado in his cell at the jail, shortly after he was arrested; that he asked Lee why he killed the man, and he said "it was one of those cases that could not be helped." This was an incriminatory admission which very nearly approximated a plenary confession of guilt. One of the officers at the jail testified that Lee told him he wished to make a confession to Lieutenant Sturdivant; and thereafter by Sturdivant's order the defendant was taken out of the cell and brought before Lieutenant Sturdivant for that purpose. Before any conversation in regard to the case between the prisoner and the officer, Mr. Powell, who stated that he had been employed to defend Lee, entered the room, and Sturdivant left Lee and his counsel alone. After Mr. Powell came, the services of a stenographer were obtained, and she wrote the following statement, which the accused signed and verified by oath: "Personally appeared before me, the undersigned notary public, . . Summerlin Compton, alias S. H. Lee, alias J. D. Compton, alias J. D. Lee; who on oath deposes and says: That I was present on the night Ben Lichtenstein was killed. The motive was not robbery, and I did not fire the shot that killed him; and I will give a full detail as to the killing." Holland, a deputy sheriff, testified: "When he made that statement he asked, 'What else, Mr. Sturdivant?' And Mr. Sturdivant told him, 'You are making this of your own voluntary and free will.'"

The fact that Holland and Mauldin testified that the defendant stated that he wanted to make a confession to Sturdivant was nothing more than an expression of intention to confess; that is, to admit everything sufficient to prove his guilt of the offense as charged. The fact that he said he wanted to confess is not an admission relating to the commission of the crime, until the confession is actually made, of a single inculpatory circumstance prior to the commission of the crime of murdering Bennie Lichtenstein, nor an ad-

mission of anything except to make a confession which might or might not be sufficient to amount to a conclusion of guilt, dependent upon whether it was or was not corroborated. To illustrate this, it may be noticed that a witness for the State stated he did not think, at the time of Lee's asking him to get him in touch with Sturdivant, that Lee actually knew the offense for which he was arrested. There was testimony on behalf of the State that would have authorized a jury to find that the battered bullet found near the body of the deceased was fired from a 32-20 pistol, and that it was the ball which killed Lichtenstein. But proof of the fact that the accused fired the shot, or what pistol he used in firing it, was dependent upon circumstantial evidence. We can not say that the evidence, though circumstantial, was not sufficient to authorize the jury to find that the accused used the pistol which was found underneath his place of residence, and that he killed Lichtenstein: but the evidence does not show to the exclusion of all reasonable doubt that Kosnofsky or Cox was present at the killing, or that either of them procured, aided, or commanded Lee to kill the deceased. Certainly no agreement or conspiracy to commit a felony was shown; and the proof that there was any agreement to commit the offense of selling and delivering liquor to Lichtenstein was very weak. If the usual rule in criminal law be applied, that where two constructions may be placed upon evidence, the one pointing to guilt and the other to innocence, the jury should give the benefit of doubt to the accused, it seems clear that Kosnofsky's testimony that he was driving the automobile merely because they had been driving around that evening "at my own request" would seem to imply, in the absence of any other evidence, that Kosnofsky was simply getting a ride for his own pleasure, without participating in, though not preventing, the intent of Lee to deliver Lichtenstein some whisky. Had there been an agreement at any time prior to the delivery of the liquor, as testified to be Kosnofsky, to rob Lichtenstein or any one else, it seems that Kosnofsky would have known that fact, and that the State would have drawn from its witness some statement in reference thereto. No evidence of any kind was introduced to show to what degree, if any, Cox participated in the crime for which Lee was being tried as a conspirator with Cox.

In this state of the proof as to conspiracy, the charge to which exception was taken in ground 24 of the motion was such error as

to require the grant of a new trial. The court charged the jury: "If two or more persons conspire and undertake to rob or commit any other felony, and if one of these during the progress of the crime kill a person, which killing is a natural and logical result of the original crime, then all the participants in that conspiracy would be guilty, the same as the actual slayer may have been guilty." The instruction is abstractly correct in a proper case; but in this case there is no evidence whatever that any of the persons charged in this indictment conspired and undertook to rob or commit any felony. When two or more persons do conspire to commit a felony, all of the participants in that conspiracy will be guilty, "the same as the actual slayer," if one of the conspirators kill a person and if the killing is a natural and logical result of the original crime; but the law does not make one of a number of conspirators engaged in executing an unlawful agreement guilty the same as the actual slayer, unless the nature of the criminal undertaking is such that a killing is a natural and logical result of the undertaking to commit the crime contemplated by the agreement or undertaking. The law does not presume that a killing will naturally and logically result from one having intoxicating liquor in his possession, or from his attempting to deliver this liquor to another who is buying it from him. In the circumstances of this case the failure of the court to define the word "felony," and to distinguish it from a misdemeanor, was especially harmful.

*Judgment reversed. All the Justices concur, except Hill and Gilbert, JJ., who dissent.*

RUSSELL, C. J., concurring specially. In my opinion, there is scarcely any right more precious than that accorded to a defendant in a criminal trial, who is presumed to be innocent and who may sometimes be innocent, than that of subjecting the witnesses against him to a cross-examination "thorough and sifting." In this case the learned trial judge sustained an objection to the question, "Don't you know that Bennie Lichtenstein carried $40,000 double-indemnity policy?" after inquiring: "What is the relevancy?" and refused to allow the question to be answered. With a profound and deep respect for the intelligence, ability, and absolute integrity of the judge, I can not concur in the opinion that mere irrelevancy is a standard by which the right of cross-examination may be abridged or limited. The purpose of a cross-examination is to sift the wit-

ness, not merely to discredit him, but to disclose to the jury for all purposes in the case the motives, the feeling, the bias of the witness, or any influence, internal or external, to which he may be subject, when he may use the testimony, or the manner in which it is given, to lay the foundation upon which may be based a theory different from that upon which the prosecution is based, which the jury in summing up the evidence on both sides may find more credible than, or at least equally credible as, the theory upon which the prosecution is proceeding. And it is the duty of the jury, between two equally reasonable hypotheses, both of which are dependent upon circumstantial evidence, to give the benefit of the doubt raised by the conflict in favor of the accused. I do not say that if there were a multiplication of irrelevant testimony, to the exclusion of anything material, in an extensive and long-drawn cross-examination, a trial judge might not properly make inquiry and determine that a sufficiently thorough cross-examination had been conducted, and that the sifting had progressed far enough, if the counsel who was conducting the examination had not, after so long a time, reached something material in the case. But the mere irrelevancy of some questions, without which an unwilling witness could not be subjected to such tests as would disclose some relevant truth to the jury of the nature to which I have referred, would be almost tantamount to a denial of the right of cross-examination "thorough and sifting." A careful consideration of the entire record in this case shows that the prosecution was endeavoring to suggest to the jury that the motive of the killing was robbery. The proof of motive in a charge of murder is not necessary, except to clear up doubt as to the identity of the person who committed it. A killing unauthorized by law, if the slayer is known, and all the circumstances of the killing show an abandoned and malignant heart, needs no further inquiry into motive. And in this case it is plain that the proof of other robberies was admitted by the judge for the purpose of showing motive, plan, scheme, device. The crimes which were proved, and which were distinct from the offense for which the defendant was indicted in this case, were robberies. Conceding that proof adduced on that line would be admissible, it would be of great advantage to the defendant if he could show that the proof employed, in part at least, for the purpose of identification was not as reasonable as the theory that the deceased perhaps had been killed by some one inter-

ested in a large sum of insurance money. Or that the witness under cross-examination was prejudiced in the prosecution of the defendant by a well-settled conviction that the murder was committed in an attempt to commit a robbery. The defendant's counsel had the right to ask the question on cross-examination. A cross-examination is not required to be confined to the highest and best evidence when he asks the witness whether he knows a particular fact. This is an inquiry, not whether what he knows is a fact, but rather as to the belief or impression of a matter which makes it to the witness a fact, whether or not it is really such.